UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

|  |  |
|---|---|
| KAMEL KASSEM and JEHAN KASSEM, | Case No. 14-11143 |
| Plaintiffs, | Honorable Laurie J. Michelson |
| v. |  |
| OCWEN LOAN SERVICING, LLC and BANK OF AMERICA, N.A., |  |
| Defendants. |  |

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART OCWEN'S MOTION TO DISMISS [31] AND  GRANTING IN PART AND DENYING IN PART BANK OF AMERICA'S MOTION FOR JUDGMENT ON THE PLEADINGS [36]

After defaulting on their home loan, Plaintiffs Kamel Kassem and Jehan Kassem filed this familiar lawsuit alleging misconduct during loan servicing and foreclosure proceedings. Because the facts are not uncommon, a large body of case law has developed dismissing the claims typically asserted in these types of suits. Plaintiffs' 205-paragraph Amended Complaint seeks to avoid this dense thicket of precedent. As will be explained, although many of the numerous claims raised by the Kassems do not state a claim upon which relief may be granted, Defendants have not carried their burden in demonstrating that all of them are without merit. Accordingly, Ocwen Loan Servicing, LLC's motion to dismiss will be GRANTED IN PART and DENIED IN PART and Bank of America, N.A.'s motion for judgment on the pleadings will be GRANTED IN PART and DENIED IN PART.

## I.

### A.

In 2001, Plaintiffs Kamel and Jehan Kassem borrowed a considerable sum to build their dream home on a lot in Bloomfield Hills, Michigan. (Dkt. 27, Am. Compl. ¶¶ 6, 8–10.)

About four years later, in November 2005, the Kassems decided to pay off their 2001 loans by obtaining a new one. In particular, they borrowed $1.12 million from American Home Mortgage Acceptance, Inc. at an adjustable interest rate starting at 1%. (Dkt. 36, BANA's Mot. for J. Pleadings Ex. A, Note at 1–2.)[1] With fair warning that the rate would rise, the Kassems backed their promise to timely repay American Home by mortgaging their home. (*See* Am. Compl. Ex. A, Mortgage.) The mortgage granted American Home the power to sell the Kassems' home if they broke their promise and provided that non-party Mortgage Electronic Registration Systems, Inc. ("MERS") would serve as the "mortgagee" and "a nominee" for American Home. (Mortgage at 1–2.)

### B.

Things initially went according to plan after the November 2005 refinancing, but when the interest rate on the loan rose to 7.43% in 2008, the loan payments, in the Kassems' words, "became onerous." (Dkt. 39, Pls.' Resp. to BANA's Mot. at 10.) BANA says that the Kassems have not made a mortgage payment since February 2008. (BANA's Mot. at 1.)

---

[1] As both Ocwen and BANA seek relief based on the pleadings, the Court presents as fact the non-conclusory allegations in the Kassems' Amended Complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the Court supplements its factual summary with uncontrovertable facts found in documents referenced in the Amended Complaint and central to its claims, e.g., the note, assignments of the mortgage, and certain letters between the parties. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997); *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999).

There were a few other changes associated with the Kassems' loan and mortgage around this time. In January 2008, American Home, which had gone bankrupt the year before, assigned the rights to service the Kassems' loan to Countrywide Bank, FSB. (Am. Comp. ¶ 25.) In August 2008, MERS, "acting solely as nominee" for American Home, assigned the mortgage to Countrywide. (Dkt. 31, Ocwen's Mot. to Dismiss Ex. B, Assignment to Countrywide.) The Kassems say that Defendant Bank of America, N.A., ("BANA") purchased Countrywide in July 2008 and began servicing their loan in 2008. (*See* Am. Compl. ¶¶ 28, 84, 118.)

In August 2008, Countrywide began foreclosure proceedings. (Am. Compl. ¶ 33.) That month, the Kassems presented BANA with a "reasonable short sale offer," but BANA rejected the offer. (Am. Compl. ¶ 35.) Though none of the parties say why, it appears that foreclosure proceedings stood still for the next three years. (*See* Am. Compl. ¶¶ 35–36.)

But in November 2011, Trott & Trott, P.C., a debt-collecting law firm, sent Kamel Kassem a letter on behalf of BANA. (BANA's Mot. Ex. E, Nov. 17, 2011 Letter from Trott & Trott; *see also* Am. Compl. ¶¶ 49–50.) The letter stated that the Kassems had defaulted on their mortgage loan and that $1.623 million was "due and owing." (*Id.*) Around this time, Trott & Trott also initiated foreclosure by advertisement proceedings (a non-judicial foreclosure process under Michigan law) by advertising in a local newspaper the upcoming sheriff's sale of the Kassems' home. (Am. Compl. ¶ 49.) The foreclosure, however, did not proceed for over two more years.

### C.

On October 1, 2012, Defendant Ocwen Loan Servicing, LLC took over as servicer of the Kassems' loan (Am. Compl. ¶¶ 51, 84), and in December 2012, it offered the Kassems a loan modification (reducing their debt by $940,000) conditioned on the Kassems making three trial

payments (Pls.' Resp. to BANA's Mot. Ex. F, Dec. 14, 2012 Letter from Ocwen). It is not entirely clear from the pleadings why the Kassems did not accept this offer, but based on the fact that the Kassems sent a letter to either Ocwen or BANA (or both) on November 1, 2012 inquiring into the balance on the account and the ownership of the debt (Am. Compl. ¶ 59), it may be that the Kassems doubted the legitimacy of Ocwen's offer.

Indeed, in October 2013, the Kassems sent both Ocwen and BANA letters saying just that and requesting that Ocwen and BANA provide a plethora of information about their account. (Pls.' Resp. to BANA's Mot. Ex. G, Oct. 28, 2013 Letter from Kassems to BANA; Pls.' Resp. to Ocwen's Mot. Ex. H, Oct. 28, 2013 Letter from Kassems to Ocwen; *see also* Am. Compl. ¶¶ 60, 109, 119.) In their letter to BANA, the Kassems referenced a second loan-modification offer—under which the debt would be reduced to $493,000—but indicated they would not accept it: "Where is the evidence Ocwen can make that offer? We will negotiate ONLY with the true HOLDER IN DUE COURSE." (Oct. 28, 2013 Letter from Kassems to BANA at 1; *see also* Oct. 28, 2013 Letter from Kassems to Ocwen at 1.) At the end of both letters the Kassems remarked, "Let's get this worked out right away. This is my [*sic*] home we're talking about." (Oct. 28, 2013 Letter from Kassems to BANA; Oct. 28, 2013 Letter from Kassems to Ocwen.)

Although BANA and Ocwen responded to the Kassems' letters (inadequately, say the Kassems) (*see* Am. Compl. ¶¶ 62–63; Pls.' Resp. to Ocwen's Mot. Ex. I; Pls.' Resp. to BANA's Mot. Ex. I), the situation was not "worked out right away." To the contrary, in a letter dated March 4, 2014, Ocwen informed the Kassems that a foreclosure sale had been scheduled. (*See* Am. Compl. ¶¶ 70, 83; Pls.' Resp. to Ocwen's Mot. Ex. K.)

**D.**

The Kassems filed this lawsuit in state court on March 3, 2014. (*See* Pls.' Resp. to Ocwen's Mot. at 13–14.) That day, they sought and obtained a temporary restraining order preventing the sheriff's sale from moving forward. (Pls.' Resp. to Ocwen's Mot. Ex. E, Mar. 4, 2014 TRO.)

Soon thereafter, Ocwen removed this case from state court to this one.

In August 2014, this Court granted the Kassems' request to file an amended complaint. (Dkt. 25.) The Kassems then filed an Amended Complaint consisting of 14 counts (which understates the number of legal claims raised). (Dkt. 27.)

Ocwen seeks dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) (Dkt. 31) and BANA seeks judgment in its favor pursuant to Rule 12(c) (Dkt. 36).

**II.**

Motions pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(c) are governed by the same standards. *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 898 (6th Cir. 2014); *Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 713 (6th Cir. 2013). As they are well known, the Court normally recites them only briefly. Here, however, more is warranted because the Kassems (or more precisely, their counsel) have erroneously argued for something other than the plausibility standard set by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

The Kassems recognize that the Supreme Court found in *Twombly* that the complaint at issue there did not state a claim upon which relief could be granted because the allegations merely showed that unlawful conduct was "possible" as opposed to "plausible." (*See* Pls.' Resp. to Ocwen's Mot. at 14; Pls.' Resp. to BANA's Mot. at 14.) But the Kassems say that *Twombly*

involved expensive, complicated litigation (it was an antitrust case) and they cite an opinion from the Sixth Circuit Court of Appeals noting that possible limitation on *Twombly*'s scope. (Pls.' Resp. to Ocwen's Mot. at 15 (citing *Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009)); *accord* Pls.' Resp. to BANA's Mot. at 15.)

But in 2009, shortly after *Gunasekera*, the Supreme Court made clear in *Iqbal* that the standards set out in *Twombly* are applicable to all types of suits. *See Iqbal*, 556 U.S. at 684 ("Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure."); *see also Courie v. Alcoa Wheel & Forged Products*, 577 F.3d 625, 629 (6th Cir. 2009) (discussing 12(b)(6) standard in the immediate wake of *Iqbal*).

So the well-settled standard is as follows: the Court accepts as fact the non-conclusory allegations in the Amended Complaint and then asks whether those permit "the reasonable inference" that Ocwen or BANA are "liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although this plausibility threshold is more than "sheer possibility that a defendant . . . acted unlawfully," it is not a "'probability requirement.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" its claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Id.* at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

6

III.

A.

The Court begins with the Kassems' claims that Ocwen and BANA violated various Michigan statutes governing the foreclosure-by-advertisement process, i.e., Counts I, VI, VII, XI, and "XVIIIII" of the Amended Complaint.

1.

The Kassems plead that Ocwen and BANA violated Michigan Compiled Laws § 600.3220 is several ways. Simplified, that statute permits adjournment of a sheriff's sale for longer than a week so long as (1) the sheriff, "at the request of the party in whose name the notice of sale is published," posts a notice of adjournment "at the place where said sale is to be made" and (2) the notice of adjournment is "published in the newspaper in which the original notice was published" each week during the adjournment. *See* Mich. Comp. Laws § 600.3220.

The Kassems assert that Ocwen and BANA violated § 600.3220 because they "fail[ed] to post [the adjournment notice] 'at the place where said sale is to be made.'" (Am. Compl. ¶ 95; *see also id.* ¶¶ 88–89, 93–94.) But this merely echoes the statutory language quoted above and is thus not presumed true under *Iqbal*. And the Kassems plead no supplementary facts indicating how they know, or why it is plausible to think that the adjournment was not posted at the place of sale: Oakland County Circuit Court. (Pls.' Resp. to Ocwen's Mot. Ex. D at Pg ID 1352; *see also* Ocwen's Mot. Ex. D.) This might be because the Kassems' believe that given the two-year adjournment beginning in March 2012, a notice should have been posted on their home once the foreclosure process restarted in 2014. (*See* Pls' Resp. to BANA's Mot. at 18.) But § 600.3220 does not say that Defendants had to do that, and the case the Kassems cite says as much. *See Yates v. U.S. Bank Nat. Ass'n*, 912 F. Supp. 2d 478, 491 (E.D. Mich. 2012) ("There is no

evidence that the notice was published and posted at Plaintiffs' home at any time [during the two-year adjournment], though it should be noted that Defendants had no statutory obligation to do so.").

The Kassems also say that Ocwen and BANA violated § 600.3220 because it "mandates that the posting be effectuated by [the] party 'whose name the notice of sale is published'" and Ocwen's name "is not contained in any of the purported adjournment notices." (Am. Compl. ¶ 96.) The Kassems misread § 600.3220. All it says is that the party requesting adjournment must be the party "name[d] [in] the notice of sale." And that party is Trott & Trott. (*See* Pls.' Resp. to Ocwen's Mot. Ex. D at Pg ID 1352; Ocwen's Mot. Ex. D.) Yet the Kassems do not plead that Trott & Trott was not the party that requested the sheriff to adjourn the sale.

The Kassems further assert that Ocwen and BANA adjourned the foreclosure between February 2012 and March 2014 but did not "post the adjournment on a weekly basis" as required by § 600.3220. (*See* Am. Compl. ¶ 95.) But the statute in fact speaks of "publish[ing]," not posting, and Ocwen has produced copies of the weekly publications from March 20, 2012 through March 4, 2014. (Ocwen's Mot. Ex. D.) In their response, the Kassems seem to have abandoned this argument leaving their conclusory allegation unadorned. (*See generally* Pls.' Resp. to Ocwen's Mot.)

In short, on the facts alleged, it is not plausible that Ocwen or BANA violated Michigan Compiled Laws § 600.3220.

**2.**

The Kassems also maintain that Ocwen and BANA violated Michigan Compiled Laws § 600.3208. That statute says, "In every case within 15 days after the first publication of the

8

notice [of foreclosure sale], a true copy shall be posted in a conspicuous place upon any part of the premises described in the notice." Mich. Comp. Laws. § 600.3208.

The Amended Complaint pleads: "Plaintiffs allege no posting on their property was effectuated." (Am. Compl. ¶ 92.) This allegation fails to say when the posting was absent from their property. Section 600.3208 says that the relevant period is 15 days after the first publication of the notice, and given the several times that foreclosure proceedings started and stopped, the Kassems' allegations should be more specific to give fair notice of their claim to Defendants.

In any event, even if Defendants proceed with a sheriff's sale at the conclusion of this suit without having posted a notice on the Kassems' property, that violation of § 600.3208 would not require unwinding that sale unless the Kassems' could show that they were somehow prejudiced by the lack of posting. *See Lessl v. CitiMortgage, Inc.*, 515 F. App'x 467, 469 (6th Cir. 2013). Yet the Kassems' allegations do not make it plausible to infer that if there had been a posting on their front door, they would have somehow been in a better position to halt the foreclosure proceedings.

### 3.

The Kassems also claim that Defendants' foreclosure runs afoul of Michigan's foreclosure-by-advertisement statutes because there are numerous defects in the chain of title. (*See* Pls.' Resp. to Ocwen's Mot. at 16 ("Plaintiffs' allegations regarding robo-signing and bad assignments are painstakingly alleged in detail in Paragraph 14 through 48 of the Amended Complaint . . . .").) The Kassems do not clearly identify the statutory provisions implicated by their defective-chain-of-title argument, but they apparently rely on Michigan Compiled Laws § 600.3204. (*See* Am. Compl. ¶¶ 44–46, 65–68.) That statute provides in part: "If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title

9

must exist before the date of sale under section 3216 evidencing the assignment of the mortgage to the party foreclosing the mortgage." Mich. Comp. Laws § 600.3204(3). It also says that a party cannot foreclose unless it is "the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage." Mich. Comp. Laws § 600.3204(1)(d).

Here, the chain of title as recorded in the Oakland County Register of Deeds shows that BANA is the current mortgagee by way of two assignments. The mortgage made MERS (as nominee for American Home) the original mortgagee and that document was recorded in the register of deeds on January 10, 2006. (*See* Mortgage at 1 ("Liber 36921 Page 668").) MERS then assigned the mortgage to Countrywide Bank and that assignment was recorded in the register on August 29, 2008. (Ocwen's Mot. Ex. B, Assignment to Countrywide Bank at 1 ("Liber 40560 Page 90").) Countrywide Bank later assigned the mortgage to BANA and that assignment was recorded on December 27, 2011. (Ocwen's Mot. Ex. C, Assignment to BANA at 1 ("Liber 43699 Page 870").) In short, there is a record chain of title evidencing that MERS assigned the mortgage to Countrywide Bank which then assigned it to BANA.

It would thus seem that BANA, as assignee of the mortgage, can foreclose without violating either § 600.3204(3) or § 600.3204(1)(d). As to § 600.3204(3), in *Livonia Properties Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC*, 399 F. App'x 97, 100–02 (6th Cir. 2010), the Sixth Circuit interpreted that statutory language as requiring only that the *record* chain of title, i.e., the chain of title available to the public through the register of deeds, evidence the assignment of the mortgage to the foreclosing party. And, in *Residential Funding Co. v. Saurman*, 805 N.W.2d 183, 184 (Mich. 2011), the Michigan Supreme Court held that MERS, "as record-holder of the mortgage," had "an interest in the indebtedness" within the meaning of

§ 600.3204(1)(d). *See also Carmack v. Bank of New York Mellon*, 534 F. App'x 508, 515 (6th Cir. 2013) ("Although MERS did not own the note, the category of parties with an 'interest in the indebtedness' under § 600.3204(1)(d) 'include[s] mortgagees of record among the parties entitled to foreclose by advertisement[.]' . . . As a result, upon assigning its security interest to BNYM, MERS validly assigned to BNYM the authority to foreclose by advertisement as the mortgagee of record"). Here, the record chain of title shows that MERS's "interest in the indebtedness" was assigned to Countrywide Bank and then to BANA.

Despite apparent statutory compliance, the Kassems insist that the chain of title is in fact defective in numerous ways. For example, they argue that the mortgage was recorded after a home equity line of credit and that an "affidavit of re-recording" to correct the out-of-order recordings is itself rife with error. (Am. Compl. ¶¶ 18–23.) As another example, the Kassems assert that American Home filed for bankruptcy in 2007 so MERS' assignment to Countywide Bank was an "illegal[] attempt to convey an interest out of [a] debtor's estate." (Am. Compl. ¶ 26.) The Kassems further assert that the person who signed the assignment from MERS to Countrywide Bank, Raymond Scodeller, "is a well-known robo-signer who was not employed by MERS." (Am. Compl. ¶ 41; *see also id.* ¶¶ 32, 37–43.) And, say the Kassems, the person who signed the assignment from Countrywide to BANA did not work at Countrywide at the time she signed. (Am. Compl. ¶ 50.)

But Kassems lack standing (in the common-law-of-contracts sense) to raise assignment defects unless they can show that these defects will cause some type of prejudice to them once a sheriff's sale is consummated. *See Carmack*, 534 F. App'x at 513 ("[A] borrower raising a § 600.3204 defect . . . must establish prejudice (such as double liability) resulting from the foreclosing party's failure to adhere to the statute's requirements."); *Conlin v. Mortgage Elec.*

11

*Registration Sys., Inc.*, 714 F.3d 355, 362 (6th Cir. 2013) (holding that § 600.3204 defects, including "robo-signing," are only actionable upon a showing of prejudice).

In this regard, the Kassems plead that in four letters sent by Ocwen and BANA, the two banks identified four different entities as being either the "creditor," "owner," or "[i]nvestor": "BANA CWG CIG HF1 1ST LIEN," "BANA LAS HF1 1ST LIENS," "Bank of America DOG NON – DSI II," and "BANK OF AMERICA, N.A." (Am. Compl. ¶ 21.) "So," say the Kassems, "no one actually knows who owns the mortgage, who is authorized to collect money, or what the exact payments, charges, fees or current balance is." (*Id.*) Elsewhere in their Amended Complaint the Kassems say that "Trusts" own their mortgage loans. (*Id.* ¶ 30; *but see id.* ¶ 31.)

But the mere fact that the Kassems do not know who holds the note does not demonstrate prejudice. This is because the Kassems do allege that any entity other than BANA is claiming ownership of the note or seeking to hold them responsible for their default under the mortgage. And other than BANA and their loan servicer, Ocwen, the Kassems have not alleged that any entity, including any of the three trusts, have sought to foreclose.

The Kassems also resist this prejudice analysis by invoking the Sixth Circuit's opinion in *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249 (6th Cir. 2014). But that case does not stand for the proposition that a non-party to an assignment can challenge its validity regardless of prejudice. Instead, the panel rejected the district court's "sweeping rule" (based on a misreading of *Livonia*) that "an individual who is not a party to an assignment may not attack the assignment's validity." *Id.* at 255. True, the appellate panel did interpret *Livonia* as permitting a non-party to an assignment to challenge the assignment to show that the assignee lacked authority to foreclose, which seems to be what the Kassems seek to do in this case. *See id.* But nothing in *Slorp* undermines *Livonia*'s justification for permitting such a challenge: that a non-

12

party should have some means to protect itself from prejudice resulting from a defective assignment. *See Livonia*, 399 F. App'x at 102 ("Obligors have standing to raise these claims [e.g., assignee's lack of title] because they cannot otherwise protect themselves from having to pay the same debt twice."). Indeed, in *Slorp*, the claimed prejudice was the *bank's* foreclosure lawsuit which cost him time and money to defend. *See id. Slorp*, 587 F. App'x at 254. Here, the Kassems elected to bring this lawsuit. And, had they not, and a sheriff's sale took place despite a defective chain of title, the Kassems would not have been prejudiced because no other entity other than BANA or Ocwen has sought to collect on the debt or foreclose on their home.

The Kassems' assertions of a defective chain of title thus do not state a claim upon which relief may be granted.

### 4.

Finally, the Kassems assert that Ocwen and BANA violated Michigan Compiled Laws § 600.3205a. (Am. Compl. ¶¶ 155–64.) But the Kassems appear to acknowledge that the only remedy that they are entitled to for a violation of that statute is to have the foreclosure by advertisement proceedings converted to a judicial foreclosure, *see Elsheick v. Select Portfolio Servicing*, 566 F. App'x 492, 499 (6th Cir. 2014). And they acknowledge that have not sought that relief in their Amended Complaint. (*See* Pls.' Resp. to BANA's Mot. at 22.)

\* \* \*

In sum, the non-conclusory allegations of the Amended Complaint do not make it plausible that Ocwen or BANA failed to comply with Michigan's foreclosure by advertisement statutes or, if they do, that the Kassems have been or will be prejudiced by Defendants' noncompliance. So Ocwen's and BANA's motions will be granted as to Counts I, VI, VII, XI, and "XVIIIIII."

13

**B.**

In Counts II and III, the Kassems allege that Ocwen and BANA violated two provisions of the Real Estate Settlement Procedures Act: 12 U.S.C. § 2605(e)(2) and (e)(3).

**1.**

The Kassems have not adequately pled a violation of 12 U.S.C. § 2605(e)(3) against either Defendant. That statutory provision prohibits a servicer—during the 60-day window following receipt of a "qualified written request" from a borrower—from "provid[ing] information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency." The Kassems plead, "Defendants failed to discontinue credit reporting during the pendency of the qualified written request." (Am. Compl. ¶ 64.) But this is not very specific as to timing: according to the Amended Complaint, the Kassems made qualified written requests to Ocwen and BANA on three different dates: January 8, 2012, November 1, 2012, and October 28, 2013.[2] (Am. Compl. ¶¶ 58–60; *see also* Pls.' Resp. to Ocwen's Mot. Ex. H.) Defendants should not be forced to guess to which "pendency" the Kassems refer.

Perhaps recognizing this pleading deficiency, the Kassems have produced two reports from credit reporting agencies. (Pls.' Resp. to Ocwen's Mot. at Ex. L.) They circle portions of the reports showing overdue loan payments for the months of November and December 2012. (*Id.*) And, as noted, the Kassems aver that they sent a qualified written request to Ocwen on November 1, 2012. (Am. Compl. ¶ 59.) Apparently then, it is the Kassems' position that since the reports reflect missed payments during the 60-day period following their November 1, 2012

---

[2] The October letter is dated October 28, 2013, but, in their Amended Complaint, the Kassems say that they sent the letter on October 29, 2013. (Am. Compl.¶ 60.) The difference is immaterial for purposes of resolving the pending motions so the Court uses the October 28, 2013 date.

letter, Ocwen is liable under § 2605(e)(3). But this is not a correct reading of the statutory language. As Ocwen points out, § 2605(e)(3) only stops it from sending information during the 60-day window—it does not prohibit it from later sending information about payments due in the 60-day window. And because the two reports were generated in December 2013 and January 2014, neither says much about when Ocwen reported the missed November and December 2012 payments—they only demonstrate that Ocwen must have sent that information sometime prior to the reports' creation. But to state a claim under § 2605(e)(3), it must be plausible that Ocwen provided credit reporting agencies with information about overdue payments in November or December 2012.

## 2.

As for 12 U.S.C. § 2605(e)(2), it gives a servicer 30 days from receipt of a "qualified written request" from a borrower to, "if applicable," (A) "make appropriate corrections in the account of the borrower" and then notify the borrower of those corrections; (B) provide the borrower, "after conducting an investigation," "a written explanation or clarification" that includes "a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer"; or (C) provide the borrower (again "after conducting an investigation") "a written explanation or clarification" that includes "information requested by the borrower or an explanation of why the information requested is unavailable."

Starting with Ocwen, the Kassems say that paragraphs 54–64, 112, and 113 of the Amended Complaint make it plausible that the loan servicer violated § 2605(e)(2). (*See* Pls.' Resp. to Ocwen's Mot. at 17.)

The Court agrees with Ocwen that the vast majority of these paragraphs are conclusory. (*See* Ocwen's Mot. at 10.) For example, paragraph 62 just says, "Neither BofA nor OCWEN

responded to these qualified written requests with the requirements of RESPA as outlined below" and paragraph 63 says that "Defendants failed to conduct the necessary investigation into the disputes tendered by Plaintiffs." (Am. Compl. ¶¶ 62, 63.) As for paragraph 113, it merely parrots (albeit at length) the language of § 2605(e)(2).

But paragraph 112 is less generic. It says, "Ocwen listed late charges of $1,188.76 which were not itemized or explained and added fraudulent charges including a property inspection fee, 'other inspection', a 'postpone and reset sale' fee and excessive publication and title fees of $622.20 and $853.00 respectively." (Am. Compl. ¶ 112.) This allegation refers to Ocwen's November 20, 2013 response to the Kassems' October 28, 2013 letter (which, say the Kassems, was a qualified written request). (*See* Am. Compl. ¶ 60; Pls.' Resp. to Ocwen's Mot. Exs. H, I.)

In its November 2013 response, Ocwen provided the following information:

| Description | Amount |
|---|---|
| Late Charge Due | 1,188.76 |
| Property Inspection Fee | 136.50 |
| Delivery/Mail Cost | 19.24 |
| Other Inspection | 255.00 |
| Posting | 105.00 |
| Postpone/ReSet Sale | 230.40 |
| Publication | 622.20 |
| Title Reports | 853.00 |
| Trustee Fees | 1,330.00 |

(Pls.' Resp. to Ocwen's Mot. Ex. I at Pg ID 1415.) Ocwen also included a summary chart providing the specific dates on which the Kassems incurred late charges and property inspection fees. (Pls.' Resp. to Ocwen's Mot. Ex. I at Pg ID 1418–19.) And Ocwen provided some explanation for those fees. (*Id.* at Pg ID 1414.) But Ocwen provided no explanation for why the Kassems were charged "Other Inspection," "Posting," and "Postpone/ReSet Sale" fees. Yet this is what Kamel Kassem asked for when he wrote to Ocwen on October 28, 2013: "Ocwen has charged me excessive fees/misc. appraisal, inspection and attorney. *Please explain why I was*

16

*charged these fees*, and how much was charged." (Pls.' Resp. to Ocwen's Mot. Ex. H at Pg ID 1406.)

So the question becomes whether § 2605(e)(2) required Ocwen to answer Kamel Kassems' letter. As noted, the statute says that "if applicable," Ocwen had to provide "a written explanation or clarification" that includes "a statement of the *reasons* for which the servicer believes the account of the borrower is correct as determined by the servicer." 12 U.S.C. § 2605(e)(2)(B) (emphasis added). Ocwen does not argue that subsection (B) was inapplicable, and the Kassems assert that "Ocwen['s] response to the QWR doesn't answer any of the questions Plaintiffs posed about excessive inspection, attorney and miscellaneous fees which are specifically requested in the Plaintiffs' letter." (Pls.' Resp. to Ocwen's Mot. at 12; *see also* Am. Compl. ¶ 110.)

Ocwen has thus not persuaded the Court that the Kassems RESPA claim should be dismissed in its entirety. *See Crugher v. Prelesnik*, 761 F.3d 610, 614 (6th Cir. 2014) ("The defendant has the burden of showing that the plaintiff has failed to state a claim for relief." (internal quotation marks omitted)); *Eichholz v. Wells Fargo Bank, NA*, No. 10-CV-13622, 2011 WL 5375375, at *3 (E.D. Mich. Nov. 7, 2011) ("Plaintiff's complaint merely recites the statutory language of § 2605(e)(2) without alleging any specific deficiencies in Defendant's RESPA response. Without more, dismissal would be appropriate. However, Plaintiff's response to Defendant's motion remedies this shortcoming by identifying a single specific flaw— Defendant's alleged failure to explain Plaintiff's $8,869.93 arrearage . . . .")

Turning to the Kassems' § 2605(e)(2) claim against BANA, the Kassems say they sent qualified written requests to BANA on January 8, 2012 and October 28, 2013. (Am. Compl. ¶¶ 60, 119.)

17

The Kassems' claim based on its October 28, 2013 letter is not plausible. As BANA points out, servicing was transferred from BANA to Ocwen on October 1, 2012. (Am. Compl. ¶¶ 51, 84; Ocwen's Mot. Ex. E, Oct. 5, 2012 Letter from Ocwen to the Kassems.) And "[a] written request does not constitute a qualified written request if it is delivered to a servicer more than 1 year after either the date of transfer of servicing or the date that the mortgage servicing loan amount was paid in full, whichever date is applicable." 24 C.F.R. § 3500.21(e)(2)(ii) (effective Jan. 16, 2009 to July 15, 2014). Although BANA conspicuously omits the language "whichever date is applicable," the Court finds that the transfer date is the one applicable here as the Kassems could submit any post-transfer written requests to their new servicer, Ocwen. As such, BANA is correct that the Kassems October 28, 2013 letter was not a qualified written request triggering BANA's duties under § 2605(e)(2) (or (e)(3) for that matter).

This leaves the January 8, 2012 letter. BANA gives short shrift to the Kassems' § 2605(e)(2) claim based on this letter. In its motion, BANA relegates it to a footnote, arguing that even if the January 2012 letter amounted to a qualified written request, it responded to the request. (BANA's Mot. n. 3.) But subsections (A) through (C) of § 2605(e)(2) do not countenance just any response and, moreover, the date of BANA's response, April 10, 2012, was after the 30-day deadline set by § 2605(e)(2).

Likewise in its reply brief, BANA conclusorily states that the "letter is outside the scope of the definition of a QWR" and cites the statutory definition in support. (BANA's Mot. at 5.) It then says, "[i]f this Court is inclined to construe this letter as a QWR, and assuming this Court is not willing to find that BANA's April 10, 2012 letter to be a sufficient response under RESPA, BANA respectfully requests that this Court limit Plaintiffs' RESPA claim under Count III to the January 8, 2012 letter and that letter only." (*Id.*) But it is not this Court's task to argue that the

January 8, 2012 letter is not a qualified written request nor is it this Court's job to argue that BANA's response complies with § 2605(e)(2). *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."). BANA has that burden, *see Crugher*, 761 F.3d at 614, and it has not carried it.

\* \* \*

In sum, Count II against Ocwen will be dismissed in its entirety save for the Kassems' claim that Ocwen violated § 2605(e)(2) by failing to explain certain fees in responding to their October 28, 2013 letter. BANA is entitled to judgment on the pleadings on Count III save for the Kassems' claim that BANA violated § 2605(e)(2) in responding to their January 8, 2012 letter.

## C.

The Kassems also assert that Ocwen (Counts IV and X) and BANA (Counts V and XII) are liable for breach of contract. Defendants are correct that these claims are not adequately pled.

The Kassems assert that Ocwen and BANA breached the mortgage by "failing to properly apply payments," "fail[ing] to manage and apply escrow and insurance payments," "overcharge[ing]," charging for "phantom services," misapplying "payments and credits," "imposing unnecessary fees," "misstating the amount due," "wrongfully foreclosing on the property," "refusing to perform in good faith," and "misstating the payment history to credit reporting agencies." (Am. Compl. ¶¶ 126, 128–29, 142, 144–45, 183–84, 193.) But these are all conclusory allegations. Which payments were not properly applied? How were they misapplied? Which fees were misstated or unnecessary? How did Defendants act in bad faith? What payment history was misreported? The Amended Complaint does not say. As such, the Court does not accept as fact these claims of breach. *See Iqbal*, 556 U.S. at 681.

19

In response to Ocwen's and BANA's assertions that their breach-of-contract claims are conclusory, the Kassems identify more fact-specific allegations in the Amended Complaint. (Pls.' Resp. to BANA's Mot. at 21.) They cite paragraph 54, which asserts in relevant part, "Defendants notified Plaintiffs that the balance payable on 11/11/11 was $1,622,988.77; On 1/1/12 was $1,166,464.26; On 3/20/12 was $1,665,404.81; On 4/16/12 was $1,496,830.59; On 10/5/12 was $1,627,219.18; On December 12, 2012 was $1,523,733.97." The Kassems also point to paragraph 112 (discussed above), which says, "Ocwen listed late charges of $1,188.76 which were not itemized or explained and added fraudulent charges including a property inspection fee, 'other inspection', a 'postpone and reset sale' fee and excessive publication and title fees of $622.20 and $853.00 respectively." (Am. Compl. ¶ 112; *see also id.* ¶ 69 (referencing overcharging of "various fees" including "fees for inspections, attorneys fees, corporate advances, interest and penalties").)

But even if these allegations are accepted as fact, the Kassems' contractual claims fail because they do not adequately identify the contractual language that Defendants allegedly breached. True, the Amended Complaint pleads sections "1 through 5 of the Uniform Covenants" of the mortgage. (Am. Compl. ¶ 125.) But those five sections number 18 paragraphs and impose dozens of obligations on both the Kassems and BANA (as successor to American Home). And the Kassems make no effort to say which of these many obligations prohibits "Defendants" (both apparently) from providing different loan balances on different dates. Or which requires itemized late charges. Or which prohibits inspection, reset sale, publication, or title fees. And while the Court and (more importantly for purposes of Rule 8's notice-pleading standard) Defendants might reasonably infer that some provision in the mortgage prohibits imposition of fraudulent fees, the Kassems do nothing more than assign the fees that label. Their

Amended Complaint sets out no factual matter making it plausible that the fees Ocwen or BANA charged were improper. (Indeed, based on the letters the Kassems sent to Defendants, they simply did not know what these fees were for.)

In short, the Amended Complaint fails to set forth factual matter permitting the reasonable inference that BANA and Ocwen breached the mortgage.

### D.

In Counts VIII and IX, the Kassems claim that Ocwen and BANA each violated the Truth in Lending Act in two ways.

### 1.

The Court starts with the Kassems' claim that both Defendants violated 15 U.S.C. § 1641(f)(2). (Am. Compl. ¶¶ 166–67, 174–75.) That statute provides in relevant part, "Upon written request by the obligor, the servicer shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation."

Defendants are correct that the Kassems' § 1641(f)(2) claim—at least in the manner characterized by the Kassems in their responses to Defendants' motions—is barred by the Truth in Lending Act's one-year statute of limitations. (*See* Ocwen's Reply at 6; BANA's Mot. at 6.) Regarding § 1641(f)(2)'s triggering event—a "written request by the obligor"—paragraphs 166 and 174 of the Amended Complaint say that the Kassems sent "written requests" to Ocwen and BANA "as noted above." Although vague, the Kassem's response to Defendants' motions direct the Court's attention to paragraph 21 of the Amended Complaint. (Pls.' Resp. to Ocwen's Mot. at 21; Pls.' Resp. to BANA's Mot. at 23.) And Defendants' conduct as alleged in *that* paragraph all took place on or before November 29, 2012. (*See* Am. Compl. ¶ 21.) Thus, based on the

Kassems' own argument, even if Defendants failed to provide the information required by § 1641(f)(2), the Kassems had only until November 29, 2013 to complain about it. *See* 15 U.S.C. § 1640(e) (providing that except for claims under §§ 1639, 1639b, and 1639c, "any action under this section may be brought . . . within one year from the date of the occurrence of the violation"). But the Kassems did not file this suit until March 3, 2014. (*See* Dkt. 1 Ex. 1, Compl.)

The Kassems acknowledge the time bar but seek to avoid it with equitable tolling. (Pls.' Resp. to BANA's Mot. at 24.) The equities are not in the Kassems' favor. They say that their TILA claim should go forward because BANA provided them with "multiple responses, each different, regarding the balance of their loan" and "[t]o this day there has still not been any convincing or proven answer" as to how much they owe. (*Id.*) But the fact that on one occasion Defendants reported that the Kassems owed $1.17 million but on another said they owed $1.67 million (*see* Am. Compl. ¶ 54) does not make it equitable to allow the Kassems to bring a tardy § 1641(f) claim: whether the higher or lower number is accurate (or neither), the Kassems fail to explain how Defendants' full compliance with § 1641(f) would have permitted them to better pay their loan. Indeed, § 1641(f) says nothing about loan balances. So the Kassems' § 1641(f)(2) claims, at least in the manner presented by the Kassems in their response briefs, are time barred.

**2.**

The Kassems also assert that both Defendants violated 15 U.S.C. § 1641(g). (Am. Compl. ¶¶ 168–69, 176–77.) That statute says, "not later than 30 days after the date on which a mortgage loan is sold or otherwise transferred or assigned to a third party, the creditor that is the new owner or assignee of the debt shall notify the borrower in writing of such transfer" and provide, among things, its contact information, where transfer of ownership of the debt is recorded, and "any other relevant information regarding the new creditor."

As an initial matter, the plain language of § 1641(g) only imposes obligations on "creditor[s]" (as opposed to loan servicers) and thus the Kassems' § 1641(g) claim cannot run against Ocwen.

As for BANA, it argues that the Kassems' allegations in support of their § 1641(g) claim are also barred by TILA's one-year statute of limitations. (BANA's Mot. at 18–19; BANA's Reply at 6–7.) (BANA also argues that the Amended Complaint does not say when the Kassems made written requests or why BANA's responses to these requests were deficient. (BANA's Mot. at 18.) But a written request is not necessary to trigger § 1641(g)'s requirements, so this argument does not apply to the Kassems' claim premised on that statutory provision.)

BANA has not shown that it is implausible that the Kassems' § 1641(g) claim is timely. BANA points to the assignment from Countrywide Bank executed on December 17, 2011 and asserts that since that transfer was well over a year prior to suit, the Kassems' § 1641(g) claim is tardy. (BANA's Reply at 6–7.) But that assignment transferred Countrywide Bank's "right, title and interest in and to a certain real estate *mortgage* made by [the Kassems], original mortgagor(s), to Mortgage Electronic Registration Systems, Inc., *Mortgagee*, . . . ." (BANA's Mot. Ex. D, Assignment to BANA at 1 (emphases added).) As far as the pleadings show, MERS never was the owner of the note or the Kassems' creditor. Yet § 1641(g) speaks of a "creditor": "not later than 30 days after the date on which a mortgage *loan* is sold or otherwise transferred or assigned to a third party, the *creditor* that is the new *owner* or assignee of the *debt* shall notify the borrower in writing of such transfer." (Emphases added.) So the Court is not persuaded that BANA has identified the correct assignment, and thus is not persuaded that the Kassems' § 1641(g) claim is time-barred.

* * *

23

In sum, the Kassems' Truth in Lending Act allegations against Ocwen and BANA do no state a claim upon which relief may be granted save for possibly the Kassems' claim that BANA violated 15 U.S.C. § 1641(g).

**E.**

In their fourteenth count (mislabeled Count "IX") the Kassems accuse Ocwen of violating the Fair Debt Collection Practices Act. Ocwen says that the allegations are "a textbook example of insufficient pleading that is impermissible under *Iqbal* and *Twombly*." (Ocwen's Mot. at 15.) This characterization is too strong, but the Court agrees with the point that underlies it.

In their response to Ocwen's motion, the Kassems argue that they "precisely alleged" Ocwen's wrongful debt-collection activity in paragraph 203 of the Amended Complaint. That paragraph reads:

> Ocwen engaged in collection activity, including but not limited to:
>
> a. Attempting to collect amounts in excess of the actual balance owed as outlined above in this Complaint
>
> b. Attempting to collect unlawful and phantom fees and charges as outlined above in this Complaint
>
> c. Attempting to collect a debt by conducting a premature foreclosure by advertisement lacking requisite notice and in an amount in excess of that which is actually owed as outlined above in this Complaint
>
> d. Failing to accurately list the contents of the advertisement.
>
> e. Preparing affidavits in advance of the auction for filing with the Registrar of Deeds.
>
> f. Failing to file a Notice of Adjournment.
>
> g. Failing to Notify Plaintiffs of the Notice of Adjournment.
>
> h. Failing to notify Plaintiffs of the foreclosure proceedings.
>
> i. Charging Plaintiffs attorney fees not authorized by statute.

(Am. Compl. ¶ 203.)

Subparagraphs d., e., and i. are conclusory. The Kassems do not plead which statements in the foreclosure advertisement were inaccurate or how an inaccurate advertisement violates the FDCPA. And they do not plead how preparing affidavits in advance of the sale violates the FDCPA or which attorney fees are prohibited by what provision of the Act.

As for subparagraphs f., g., and h. and part of subparagraph c., the Court has already found that the Amended Complaint fails to make it plausible that the foreclosure sale was not properly adjourned, *see* Part III.A.1, and it is plain that Ocwen did notify the Kassems of the foreclosure proceedings (*see e.g.*, Pls.' Resp. to Ocwen's Mot. Exs. J, I). Moreover, the Kassems identify no provisions of the FDCPA requiring Ocwen to have provided notice of the foreclosure proceedings or adjournment of those proceedings.

This leaves subparagraphs a., b., and c. But allegations that Ocwen attempted to collect "amounts in excess of the actual balance owed" and "unlawful and phantom fees and charges" are conclusory. When did Ocwen engage in these acts? What was the actual balance as compared to what Ocwen tried to collect? Which "fees and charges" were unlawful? Similar questions might be asked of the Kassems' assertion that Ocwen "premature[ly] foreclose[ed] by advertisement" without "requisite notice." At what point in time and by what actions did Ocwen attempt to foreclosure too early? And what notice was required by the FDCPA but was not provided?

The reference in paragraph 203—"as outlined above in this Complaint"—does little to help answer these questions. (Especially given that 202 paragraphs precede the reference.) In their response to Ocwen's motion, the Kassems say that "as outlined above" refers to paragraphs 54 through 56 and 61 through 64 of the Amended Complaint, "as well as various other allegations including the RESPA allegations and wrongful foreclosure allegations." (Pls.' Resp.

2:14-cv-11143-LJM-RSW   Doc # 45   Filed 09/18/15   Pg 26 of 27   Pg ID 1854

to Ocwen's Mot. at 23.) Paragraph 54 appears to be the most on point: it alleges that on six different dates between November 2011 and December 2012, "Defendants" provided six different figures—ranging from $1.17 million to $1.67 million—for the "balance payable." While this raises an inference of a false statement prohibited by the FDCPA, the allegation falls short of making it plausible that Ocwen violated the Act. This is because paragraph 54 (1) accuses "Defendants" rather than Ocwen of wrongful action, (2) does not allege that balances were calculated in the same way (e.g., did some include interest, taxes, and fees while others did not?), and, perhaps most significantly, (3) does not assert that Ocwen provided these balances in "connection with the collection of any debt," *see* 15 U.S.C. § 1692e; *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) ("[F]or a communication to be in connection with the collection of a debt, an animating purpose of the communication must be to induce payment by the debtor.").

Accordingly, the Kassems have not pled a viable Fair Debt Collection Practices Act claim against Ocwen.

## IV.

The Kassems have raised a lot of claims, the vast majority of which are without merit. Still, upon completing an individualized assessment of each, the Court finds that Defendants have not carried their burden in showing that all of the Kassems' claims are implausible. The Court thus ORDERS that all the claims in Kassems' Amended Complaint as against Ocwen are dismissed under Rule 12(b)(6) except for the Kassems' claim that Ocwen violated 12 U.S.C. § 2605(e)(2) by failing to explain certain fees when responding to the Kassems' October 28, 2013 letter to Ocwen. Further, BANA is entitled to judgment on the pleadings under Rule 12(c) on all of the claims in the Amended Complaint except for (1) the Kassems' claim that BANA

violated 12 U.S.C. § 2605(e)(2) when responding to the Kassems' January 8, 2012 letter to BANA and (2) the Kassems' claim that BANA violated 15 U.S.C. § 1641(g). The Kassems' second request to amend their complaint—inappropriately raised in their responsive briefing—is DENIED.

       SO ORDERED.

               s/Laurie J. Michelson
               LAURIE J. MICHELSON
               UNITED STATES DISTRICT JUDGE

Dated:  September 18, 2015

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 18, 2015.

               s/Jane Johnson
               Case Manager to
               Honorable Laurie J. Michelson